UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANDREAS KUHBIER,

                          Plaintiff,

      v.

MCCARTNEY, VERRINO &
ROSENBERRY VESTED PRODUCER
PLAN; MCCARTNEY, VERRINO &
ROSENBERRY VESTED PRODUCER
PLAN ADMINISTRATOR; MCCARTNEY,
VERRINO & ROSENBERRY INSURANCE
AGENCY; MCCARTNEY &
ROSENBERRY GROUP, INC.,

                          Defendants.

No. 14-CV-888 (KMK)

OPINION & ORDER

---

Appearances:

Elizabeth E. Hunter, Esq.
William D. Frumkin, Esq.
Frumkin & Hunter LLP
Goshen, NY
White Plains, NY
*Counsel for Plaintiff*

Michael J. Cannon, Esq.
Lorin A. Donnelly, Esq.
Milber Makris Plousadis & Seiden, LLP
Woodbury, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiff Andreas Kuhbier ("Plaintiff") filed suit against Defendants McCartney, Verrino

& Rosenberry Vested Producer Plan; McCartney, Verrino & Rosenberry Vested Producer Plan

Administrator; McCartney, Verrino & Rosenberry Insurance Agency; and McCartney &

Rosenberry Group, Inc. alleging, among other things, that Defendants breached their obligations

under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1132(a)(1)(B), with respect to certain amounts owed to him under a qualifying plan, and that

Defendants similarly breached their contractual obligations to Plaintiff.  Plaintiff also alleges that

Defendants failed to comply with a document request under ERISA and that Defendants

breached other contractual obligations set forth in Plaintiff's employment agreement.  Plaintiff

moves for partial summary judgment with respect to his claim for unpaid distributions under

ERISA, and Defendants cross-move for summary judgment on the same claim as well as for

Plaintiff's breach of contract claims.  For the following reasons, Plaintiff's Motion is granted in

part and denied in part, and Defendants' Motion is denied.

## I.  Background

### A.  Factual Background

The following facts are taken from the Parties' respective statements pursuant to Local

Rule 56.1 and the documents submitted by each side in support of their Motions.

Defendant McCartney & Rosenberry Group, Inc. ("McCartney & Rosenberry" or the

"Agency") was, at all relevant times, engaged in the insurance agency business.  (*See* Defs.'

Statement of Material Facts ("Defs.' 56.1") ¶ 7 (Dkt. No. 82); Pl.'s Counter-Statement Pursuant

to Local Rule 56.1 ("Pl.'s Resp. 56.1") ¶ 7 (Dkt. No. 93); *see also* Decl. of Lorin A. Donnelly

("Donnelly Decl.") Ex. I (Dkt. No. 81).)  Verrino & Associates, Inc. ("Verrino & Associates"), a

former defendant in this case, was also engaged in the insurance agency business.  (*See* Defs.'

56.1 ¶ 6; Pl.'s Resp. 56.1 ¶ 6; *see also* Donnelly Decl. Ex. H.)

Plaintiff began working as an independent contractor for Verrino & Associates in May

2005, (*see* Donnelly Decl. Ex. E ("McCartney Tr."), at 27–28; Donnelly Decl. Ex. H; *see also*

Defs.' 56.1 ¶ 10; Pl.'s Resp. 56.1 ¶ 10), and, at the same time, became an independent contractor

for McCartney & Rosenberry, (*see* McCartney Tr. 27–28; Donnelly Decl. Ex. I; *see also* Pl.'s Statement Pursuant to Local Rule 56.1 ("Pl.'s 56.1") ¶ 3 (Dkt. No. 88); Defs.' Local Rule 56.1 Resp. to Pl.'s Statement of Material Facts ("Defs.' Resp. 56.1") ¶ 3 (Dkt. No. 90); Defs.' 56.1 ¶ 11; Pl.'s Resp. 56.1 ¶ 11).  On May 3, 2005, Plaintiff entered into producer agreements with both Verrino & Associates and McCartney & Rosenberry.  (*See* Donnelly Decl. Exs. H, I; *see also* Donnelly Decl. Ex. F ("Verrino Tr."), at 26; Pl.'s 56.1 ¶ 3; Defs.' Resp. 56.1 ¶ 3; Defs.' 56.1 ¶ 12; Pl.'s Resp. 56.1 ¶ 12.)  Plaintiff's work as a producer consisted of soliciting consumers for insurance and selling insurance.  (*See* Donnelly Decl. Ex. D ("Kuhbier Tr."), at 20; *see also* Defs.' 56.1 ¶ 14; Pl.'s Resp. 56.1 ¶ 14.)  Plaintiff was paid by commission.  (*See* Verrino Tr. 28; *see also* Defs.' 56.1 ¶ 19; Pl.'s Resp. 56.1 ¶ 19.)

   1.   The 2009 Agreement

  On January 1, 2009, McCartney & Rosenberry acquired the outstanding stock of Verrino & Associates.  (*See* Verrino Tr. 17–19; Donnelly Decl. Ex. G; *see also* Defs.' 56.1 ¶ 8; Pl.'s Resp. 56.1 ¶ 8.)  Later, in February 2009, Plaintiff, now an employee of McCartney & Rosenberry, (*see* Verrino Tr. 31–32; *see also* Defs.' 56.1 ¶ 20; Pl.'s Resp. 56.1 ¶ 20), entered into a new producer agreement (the "2009 Agreement") with McCartney & Rosenberry that was retroactive to January 2009 and superseded the prior producer agreements, (*see* Donnelly Decl. Ex. K ("2009 Agreement"); *see also* Kuhbier Tr. 46–47; Pl.'s 56.1 ¶ 4; Defs.' Resp. 56.1 ¶ 4; Defs.' 56.1 ¶ 30; Pl.'s Resp. 56.1 ¶ 30).  The 2009 Agreement included three schedules—A, B, and C—when it was signed.  (*See* Kuhbier Tr. 49–51; McCartney Tr. 48; 2009 Agreement; *see also* Pl.'s 56.1 ¶ 5; Defs.' Resp. 56.1 ¶ 5; Defs.' 56.1 ¶ 31; Pl.'s Resp. 56.1 ¶ 31.)  Most relevant here, the 2009 Agreement provides that the producer "may participate in [McCartney & Rosenberry's] Vested Producer Plan, subject to the terms and conditions set forth in

SCHEDULE B hereto."  (2009 Agreement 3; *see also* Defs.' 56.1 ¶ 36; Pl.'s Resp. 56.1 ¶ 36.)

Schedule B of the 2009 Agreement, entitled "Vested Producer Plan," provides that "[o]n the

seventh (7th) anniversary of the Employment Date, Producer shall become eligible to participate

in [McCartney & Rosenberry's] Vested Producer Plan as follows."  (2009 Agreement, at

Schedule B; *see also* Pl.'s 56.1 ¶¶ 7–8; Defs.' Resp. 56.1 ¶¶ 7–8; Defs.' 56.1 ¶ 39; Pl.'s Resp.

56.1 ¶ 39.)  The Vested Producer Plan is set forth as follows:

> a.   [McCartney & Rosenberry] will maintain an ongoing and updated listing of Producer's accounts, which [McCartney & Rosenberry] will provide to Producer for review on a periodic basis.  All such accounts coded to Producer (excluding any Life, Health or Employee Benefit policies) shall be referred to herein as Producer's Book of Business.

> b.   Upon the Producer's retirement or death ("Termination Date"), [McCartney & Rosenberry] shall pay to Producer (or his/her estate) a bonus amount equal to thirty-five percent (35%) of the sum of all gross commissions paid to [McCartney & Rosenberry] with respect to Producer's Book of Business over the prior 12-month period.  Such bonus shall be payable in equal monthly installments on the first of each month for 60 months following the Termination Date.

> c.   Any violation of Sections 5 or 6 of this Agreement by Producer will result in forfeiture of the bonus payable under the Vested Producer Plan and will require Producer to immediately return all payments already received.

> d.   The Employment Date shall be the date hereof; provided, however, if Producer had been engaged previously on a continuous basis as an independent contractor prior to the date hereof, the Employment Date, shall be deemed to have commenced on the date of the Producer's first independent contract agreement.

> e.   The parties intend that this Vested Producer Plan comply with Section 409A of the Internal Revenue Code, the applicable Treasury Regulations promulgated thereunder and Internal Revenue Service Notice 2005-1, and shall be interpreted consistently therewith.

(2009 Agreement, at Schedule B.)  Section 5 of the 2009 Agreement prohibits Plaintiff from

disclosing confidential information or using confidential information for his own benefit without

the express consent of McCartney & Rosenberry.  (*See id.* at 2; *see also* Defs.' 56.1 ¶ 33; Pl.'s

Resp. 56.1 ¶ 33.)  Section 6 of the 2009 Agreement prohibits Plaintiff for a period of five years

from soliciting or attempting to influence any accounts handled by McCartney & Rosenberry, or soliciting or attempting to persuade any other producer or salesperson of McCartney & Rosenberry to work for or represent another insurance broker, insurance agent, or insurance company.  (*See* 2009 Agreement 2; *see also* Defs.' 56.1 ¶ 34; Pl.'s Resp. 56.1 ¶ 34.)  Schedule C of the 2009 Agreement provides that with respect to item (d) of the Vested Producer Plan, Plaintiff's first contract date was May 5, 2005.  (*See* 2009 Agreement, at Schedule C; *see also* Pl.'s 56.1 ¶ 78; Defs.' Resp. 56.1 ¶ 78; Defs.' 56.1 ¶ 43; Pl.'s Resp. 56.1 ¶ 43.)

The 2009 Agreement also addresses the issue of amendment.  Specifically, the 2009 Agreement states that "[t]his written Agreement contains the entire Agreement between the parties and shall supersede any and all other agreements between the parties."  (2009 Agreement 3; *see also* Pl.'s 56.1 ¶ 61; Defs.' Resp. 56.1 ¶ 61.)  The 2009 Agreement goes on to stipulate that "no waiver or modification of this Agreement or any covenant, condition, or limitation herein contained shall be valid unless in writing and duly executed by the parties to be charged therewith."  (2009 Agreement 3; *see also* Pl.'s 56.1 ¶ 62; Defs.' Resp. 56.1 ¶ 62.)

Beyond the Vested Producer Plan, the 2009 Agreement includes a number of other relevant provisions.  Among other things, the 2009 Agreement provides that the producer (Plaintiff) was "an at-will employee whose employment with [McCartney & Rosenberry] shall be terminable by either party at any time and for any reason, subject to applicable law."  (2009 Agreement 1; *see also* Pl.'s 56.1 ¶ 69; Defs.' Resp. 56.1 ¶ 69; Defs.' 56.1 ¶ 32; Pl.'s Resp. 56.1 ¶ 32.)  The 2009 Agreement stipulates also that "[McCartney & Rosenberry] shall reimburse Producer for reasonable and necessary business expenses in accordance with SCHEDULE A."  (2009 Agreement 2; *see also* Defs.' 56.1 ¶ 35; Pl.'s Resp. 56.1 ¶ 35.)  The 2009 Agreement offers, separate from the Vested Producer Plan, participation in a "[s]imple IRA" whereby a

producer may contribute his or her own pre-tax income to the retirement plan and McCartney & Rosenberry will contribute up to $6,000.  (*See* 2009 Agreement, at Schedule A; *see also* Defs.' 56.1 ¶ 37; Pl.'s Resp. 56.1 ¶ 37.)  Finally, paragraph 10 of Schedule A to the 2009 Agreement provides that the producer is "required to produce a minimum of $50,000 in new Property & Casualty insurance premiums per month.  [McCartney & Rosenberry] shall review production on a monthly basis and reserves the right to adjust the amount drawn against future commissions if Producer does not meet the sales goals or fulfill his/her obligations under this contract."  (2009 Agreement, at Schedule A; *see also* Defs.' 56.1 ¶ 38; Pl.'s Resp. 56.1 ¶ 38.)

In addition to Plaintiff, the Vested Producer Plan was offered to at least two other employees: Brian Berkson and Allen Mednick.  (*See* Verrino Tr. 63–64; *see also* Pl.'s 56.1 ¶ 15; Defs.' Resp. 56.1 ¶ 15; Defs.' 56.1 ¶ 46; Pl.'s Resp. 56.1 ¶ 46.)

On January 4, 2010, Plaintiff signed an amendment to the 2009 Agreement, Schedule D, which amended paragraph 10 of Schedule A and required Plaintiff to now produce "a minimum of $7500 in gross new Property & Casualty insurance revenue per month."  (2009 Agreement, at Schedule D; *see also* Defs.' 56.1 ¶ 48; Pl.'s Resp. 56.1 ¶ 48.)  On January 15, 2010, Plaintiff signed another amendment that, among other things, removed the provision allowing for reimbursement of certain expenses.  (*See* 2009 Agreement, at Schedule E; *see also* Defs.' 56.1 ¶ 50; Pl.'s Resp. 56.1 ¶ 50.)  A Schedule F removing the Vested Producer Plan was presented to Plaintiff by Defendants in November 2011.  (*See* Kuhbier Tr. 114, 118; *see also* Pl.'s 56.1 ¶ 63; Defs.' Resp. 56.1 ¶ 63.)  In January 2012, Defendants asked Plaintiff to sign Schedule F, (*see* Kuhbier Tr. 115–16; *see also* Pl.'s 56.1 ¶ 64; Defs.' Resp. 56.1 ¶ 64), but Plaintiff refused and never signed Schedule F, (*see* Kuhbier Tr. 117; McCartney Tr. 87–88; *see also* Pl.'s 56.1 ¶ 67; Defs.' Resp. 56.1 ¶ 67; Defs.' 56.1 ¶ 52; Pl.'s Resp. 56.1 ¶ 52).

2. Administration of the Vested Producer Plan

The benefits provided by the Vested Producer Plan are paid out of McCartney & Rosenberry's general account.  (*See* McCartney Tr. 105–06; Verrino Tr. 90; *see also* Pl.'s 56.1 ¶ 19; Defs.' Resp. 56.1 ¶ 19.)  The terms of the Vested Producer Plan were determined by various owners of McCartney & Rosenberry after consultation with an attorney.  (*See* McCartney Tr. 28, 65; *see also* Pl.'s 56.1 ¶ 20; Defs.' Resp. 56.1 ¶ 20.)

To qualify for benefits under the Vested Producer Plan, a producer must have worked for at least seven years from his or her initial date of employment, must no longer be working at McCartney & Rosenberry, and must not have violated Sections 5 and 6 (the confidentiality and non-compete clauses) of the 2009 Agreement.  (*See* McCartney Tr. 81; *see also* Pl.'s 56.1 ¶ 32; Defs.' Resp. 56.1 ¶ 32.)  Scot McCartney, one of the owners of McCartney & Rosenberry, also added that the process for determining whether a producer qualified for benefits under the Vested Producer Plan included "making sure that they did their job, and so on and so forth." (McCartney Tr. 81; *see also* Defs.' Resp. 56.1 ¶ 32.)

The first two steps involve simply verifying that the producer had worked for at least seven years and was no longer with McCartney & Rosenberry.  (*See* McCartney Tr. 81, 96; *see also* Pl.'s 56.1 ¶¶ 33–34; Defs.' Resp. 56.1 ¶¶ 33–34.)  Determining compliance with Sections 5 and 6, however, is more complicated.  McCartney testified that the owners would be generally responsible for ensuring that an otherwise qualified producer had not violated Sections 5 and 6 during his or her tenure and was not doing so after terminating his or her employment.  (*See* McCartney Tr. 98, 101–03; *see also* Pl.'s 56.1 ¶¶ 35–36; Defs.' Resp. 56.1 ¶¶ 35–36; Defs.' 56.1 ¶ 56; Pl.'s Resp. 56.1 ¶ 56.)  Though there is no formal system for monitoring compliance with Sections 5 and 6, McCartney testified that he is careful to hire trustworthy employees so as to

avoid any issues with those provisions.  (*See* McCartney Tr. 77–78; *see also* Pl.'s 56.1 ¶ 37;
Defs.' Resp. 56.1 ¶ 37.)  Beyond that, McCartney sometimes directs employees to alert him if
they have heard of an account leaving, (*see* McCartney Tr. 105; *see also* Pl.'s 56.1 ¶ 38; Defs.'
Resp. 56.1 ¶ 38; Defs.' 56.1 ¶ 57; Pl.'s Resp. 56.1 ¶ 57), and John Verrino, another owner,
testified that he might become suspicious of a violation if he started to see "systematic things
happen to [the producer's] book," such as "cancellations com[ing] in" or loyal clients leaving,
(Verrino Tr. 78; *see also* Pl.'s 56.1 ¶ 40; Defs.' Resp. 56.1 ¶ 40).  Both McCartney and Verrino
indicated that they would investigate if they ever suspected a violation of Sections 5 or 6.  (*See*
McCartney Tr. 78; Verrino Tr. 90; *see also* Pl.'s 56.1 ¶ 41; Defs.' Resp. 56.1 ¶ 41.)

     Once it is determined that a producer is eligible to receive benefits under the Vested
Producer Plan, the next step is to calculate the amount of benefits.  (*See* McCartney Tr. 96–97;
*see also* Pl.'s 56.1 ¶ 44; Defs.' Resp. 56.1 ¶ 44.)  The amount to be paid to a qualifying producer
under the Vested Producer Plan is calculated at 35% of the commissions earned by the producer
for McCartney & Rosenberry during the 12-month period preceding his or her retirement or
death.  (*See* 2009 Agreement, at Schedule B.)  Though there is some dispute as to how the
amount is calculated, the Parties are in agreement that the amount is derived, at least in part,
from the computer-generated "Producer Reports" or "Production Reports," distributed monthly
to producers as a way to track the producers' commissions.  (*See* McCartney Tr. 65–68; Verrino
Tr. 74; *see also* Pl.'s 56.1 ¶¶ 26–27, 31; Defs.' Resp. 56.1 ¶¶ 26–27, 31; Defs.' 56.1 ¶¶ 62–63;
Pl.'s 56.1 ¶¶ 62–63.)  From those reports, the Agency determines the "total amount of
commission paid to the [A]gency that's reflected in [the producer's] [B]ook of [B]usiness," or, in
other words, the amount of commission paid to the Agency that is attributable to the producer.
(*See* McCartney Tr. 72; *see also* Pl.'s 56.1 ¶ 47; Defs.' Resp. 56.1 ¶ 47.)  The Parties agree that

not all commission earned by the producer is included when calculating the 35% payout, but they disagree as to some of the categories of accounts that are excluded.  (*See* Defs.' 56.1 ¶ 67; Pl.'s Resp. 56.1 ¶ 67; *see also* Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n") 3 n.1 (Dkt. No. 92).)

### 3.  Plaintiff's Performance At and Departure From the Agency

Throughout his time at the Agency, Plaintiff was among the producers who were unable to meet his production goals.  (*See* McCartney Tr. 86, 88–89, 91, 125; Verrino Tr. 123–24; *see also* Defs.' 56.1 ¶ 68; Pl.'s Resp. 56.1 ¶ 68.)  According to Defendants, for a period of time, the owners held weekly meetings with producers to discuss their performance, (*see* McCartney Tr. 40–41; *see also* Defs.' 56.1 ¶ 27), but these producer-only meetings did not last Plaintiff's entire term of employment, (*see* McCartney Tr. 41–42; *see also* Kuhbier Tr. 67–68; Pl.'s Resp. 56.1 ¶ 27).

Plaintiff testified, however, it was not until October 2010, when the owners presented Plaintiff with the amendment to the 2009 Agreement removing the provisions related to expense reimbursement, that he became aware that the owners were dissatisfied with his performance. (*See* Kuhbier Tr. 105–07; *see also* Pl.'s Resp. 56.1 ¶ 69.)  A letter from April 2011 indicates that McCartney and Verrino met with Plaintiff around that time to discuss the fact that he had not met his production goals.  (*See* McCartney Tr. 124–25; Donnelly Decl. Ex. R; *see also* Defs.' 56.1 ¶ 81; Pl.'s Resp. 56.1 ¶ 81.)  Plaintiff further attested that in November 2011, he met with McCartney and Verrino to discuss performance issues related to his inability to retain and sign new clients.  (*See* Kuhbier Tr. 111; *see also* Defs.' 56.1 ¶ 84; Pl.'s Resp. 56.1 ¶ 84.)  At this meeting, McCartney and Verrino discussed with Plaintiff the possibility of removing him from

the Vested Producer Plan.  (*See* Kuhbier Tr. 118; McCartney Tr. 84–85; *see also* Pl.'s 56.1 ¶ 63;

Defs.' Resp. 56.1 ¶ 63; Defs.' 56.1 ¶ 85; Pl.'s Resp. 56.1 ¶ 85.)

At any rate, there is no dispute that in January 2012, one of the owners wanted to

terminate Plaintiff's employment, although the Agency ultimately decided to retain Plaintiff.

(*See* Verrino Tr. 131–32; *see also* Pl.'s 56.1 ¶ 71; Defs.' Resp. 56.1 ¶ 71.)  It was shortly after

this decision that the owners approached Plaintiff with Schedule F, which purported to eliminate

the Vested Producer Plan, and asked for his signature on the amendment.  (*See* Kuhbier Tr. 115–

16; McCartney Tr. 139; *see also* Pl.'s 56.1 ¶¶ 65–66; Defs.' Resp. 56.1 ¶¶ 65–66.)  Plaintiff

refused to sign Schedule F.  (*See* Kuhbier Tr. 117; McCartney Tr. 89; *see also* Pl.'s 56.1 ¶ 67;

Defs.' Resp. 56.1 ¶ 67.)  On January 13, 2012, Plaintiff received the following letter from

McCartney and Verrino:

> This letter will serve as an acknowledgment that you have refused to sign
> Amendment "F" of your producer contract that was given to you on Jan 9th, 2012.
> This amendment specifically refers to the removal of your "Producer Vested"
> retirement plan.
>
> . . . .
>
> It is important to note that this plan differs from your deferred compensation
> plan, which is provided to you and is offered to all employees.  In addition, this
> plan was designed to give you an additional enhancement to your contract in order
> to encourage the longevity of your employment at [McCartney & Rosenberry]. . . .
>
> This letter will also serve as notice the [sic] you are in violation of your
> producer contract dated Jan 9th, 2009, for "Lack of production" and it is imperative
> that you attempt to fix the situation immediately as your future with [McCartney &
> Rosenberry] is in jeopardy.

(Donnelly Decl. Ex. V; *see also* Pl.'s 56.1 ¶ 68; Defs.' Resp. 56.1 ¶ 68; Defs.' 56.1 ¶ 87; Pl.'s

Resp. 56.1 ¶ 87.)

By letter dated June 20, 2012, Plaintiff resigned from his position at McCartney &

Rosenberry.  (*See* Donnelly Decl. Ex. W; *see also* Pl.'s 56.1 ¶ 82; Defs.' Resp. 56.1 ¶ 82; Defs.'

56.1 ¶ 101; Pl.'s Resp. 56.1 ¶ 101.)  In a letter dated the same day, McCartney acknowledged

receipt of Plaintiff's resignation and asked that Plaintiff's last day at work be moved up from

July 3, 2012 to June 29, 2012.  (*See* Donnelly Decl. Ex. X; *see also* Pl.'s 56.1 ¶ 85; Defs.' Resp.

56.1 ¶ 85; Defs.' 56.1 ¶ 102; Pl.'s Resp. 56.1 ¶ 102.)  McCartney also attached a copy of the

2009 Agreement and stated: "We trust that you will uphold your obligations of your contract,

particularly those items that make reference to your responsibilities once you have left

[McCartney & Rosenberry]."  (Donnelly Decl. Ex. X; *see also* Pl.'s 56.1 ¶ 85; Defs.' Resp. 56.1

¶ 85; Defs.' 56.1 ¶ 102; Pl.'s Resp. 56.1 ¶ 102.)

    Plaintiff never received any benefits under the Vested Producer Plan.  (*See* Verrino Tr.

159; *see also* Pl.'s 56.1 ¶ 121; Defs.' Resp. 56.1 ¶ 121; Defs.' 56.1 ¶ 103; Pl.'s Resp. 56.1

¶ 103.)  Defendants assert that Plaintiff never received any benefits under the Vested Producer

Plan because he failed to reach his sales objectives at the Agency as set forth in the 2009

Agreement.  (*See* Defs.' 56.1 ¶ 103.)

    Verrino testified that it had never come to his attention, nor had he ever suspected, that an

employee violated Sections 5 or 6 of the 2009 Agreement.  (*See* Verrino Tr. 77–78; *see also* Pl.'s

56.1 ¶ 89; Defs.' Resp. 56.1 ¶ 89.)  Verrino also testified that he never suspected or believed that

Plaintiff had violated Sections 5 or 6.  (*See* Verrino Tr. 156–57; *see also* Pl.'s 56.1 ¶ 90; Defs.'

Resp. 56.1 ¶ 90.)

### 4.  Plaintiff's Post-Termination Activity

    During the course of this litigation, Defendants obtained, through discovery, certain of

Plaintiff's cell phone records for the period of June 1, 2012 through December 31, 2012.  (*See*

Decl. of Elizabeth E. Hunter, Esq., in Supp. of Pl.'s Mot. for Partial Summ. J. ("Hunter Decl.")

¶¶ 20–21 (Dkt. No. 86); *see also* Pl.'s 56.1 ¶¶ 98–99; Defs.' Resp. 56.1 ¶¶ 98–99.)  The

requested phone records relate to calls made by Plaintiff to three different numbers, belonging to the "Highway Rehab" account, Peerless Insurance Company, and Griffin Landscaping.  (*See* Hunter Decl. ¶ 19; Decl. of Andreas Kuhbier in Supp. of Pl.'s Mot. for Partial Summ. J. ("Kuhbier Decl.") ¶ 12 (Dkt. No. 87); *see also* Pl.'s 56.1 ¶ 97; Defs.' Resp. 56.1 ¶ 97.)[1]  The records indicate that Plaintiff made three calls to the telephone number associated with the Highway Rehab account, ten calls to the number associated with the Peerless Insurance Company, and two calls to the number associated with Griffin Landscaping.  (*See* Hunter Decl. Exs. N, O.)[2]

The Highway Rehab account was an account Plaintiff wrote for the Agency.  (*See* Kuhbier Decl. ¶ 3; *see also* Pl.'s 56.1 ¶ 101; Defs.' Resp. 56.1 ¶ 101.)  Shortly after Plaintiff left the Agency, the Highway Rehab account indicated that it was going to leave the Agency and return to its former insurance agent.  (*See* Kuhbier Decl. ¶ 5; *see also* Pl.'s 56.1 ¶ 103; Defs.' Resp. 56.1 ¶ 103.)  Sometime in September or October 2012, the Agency contacted Plaintiff and asked him to help convince the Highway Rehab account to stay with the Agency.  (*See* Kuhbier Decl. ¶ 6; *see also* Pl.'s 56.1 ¶ 103; Defs.' Resp. 56.1 ¶ 103.)  Plaintiff did, in fact, call the number associated with the Highway Rehab account in, he alleges, an effort to retain its business.  (*See* Kuhbier Decl. ¶ 8; *see also* Pl.'s 56.1 ¶ 104.)

Peerless Insurance Company is an insurance company whose policies the Agency sold to some of its clients.  (*See* Kuhbier Decl. ¶ 9; *see also* Pl.'s 56.1 ¶ 106; Defs.' Resp. 56.1 ¶ 106.)

---

[1] Defendants originally asked for calls to a number they contended was associated with "Mahopac Landscaping," but the number was, in fact, for Griffin Landscaping.  (*See* Kuhbier Decl. ¶ 12.)

[2] The declaration from Plaintiff's counsel detailing the phone calls inaccurately relays the information in the phone records.  (*See* Hunter Decl. ¶ 22.)

Plaintiff alleges that the calls he made to the Peerless Insurance Company were for the purpose of arranging dinner with the underwriter he had worked with at Peerless Insurance Company, with whom he had purportedly become good friends.  (*See* Kuhbier Decl. ¶¶ 10–11; *see also* Pl.'s 56.1 ¶¶ 107–108.)

Griffin Landscaping is an account that Plaintiff brought to McCartney & Rosenberry. (*See* Kuhbier Decl. ¶ 12; *see also* Pl.'s 56.1 ¶ 109; Defs.' Resp. 56.1 ¶ 109.)  Plaintiff alleges that prior to and after he worked at the Agency, Griffin Landscaping was the landscaper for his home and for the home owners' association with which he is involved.  (*See* Kuhbier Decl. ¶ 13; *see also* Pl.'s 56.1 ¶ 110.)  Plaintiff attests that he is in contact with Griffin Landscaping from time-to-time regarding various landscaping issues.  (*See* Kuhbier Decl. ¶ 13; *see also* Pl.'s 56.1 ¶ 110.)

Since leaving the Agency, Plaintiff has been employed with McNeil & Company as a marketing manager.  (*See* Kuhbier Tr. 9, 13; *see also* Pl.'s 56.1 ¶ 114; Defs.' Resp. 56.1 ¶ 114.) Plaintiff testified that McNeil & Company is a managing general insurance agent that "create[s] programs, specific insurance programs, [and] distribute[s] them through an agency network." (*See* Kuhbier Tr. 10–11; *see also* Pl.'s 56.1 ¶¶ 115–16; Defs.' Resp. 56.1 ¶¶ 115–16.)  Plaintiff further testified that the clients of McNeil & Company are insurance agencies, and that McCartney & Rosenberry is one of McNeil & Company's clients.  (*See* Kuhbier Tr. 11, 15; *see also* Pl.'s 56.1 ¶ 117; Defs.' Resp. 56.1 ¶ 117.)  Plaintiff indicated that he no longer sells insurance.  (*See* Kuhbier Tr. 71; *see also* Pl.'s 56.1 ¶ 118; Defs.' Resp. 56.1 ¶ 118.)

### B.  Procedural History

Plaintiff filed his Complaint on February 11, 2014.  (*See* Dkt. No. 1.)  Plaintiff brought four claims for relief: (1) a claim under ERISA for recovery of benefits allegedly owed under the Vested Producer Plan; (2) a claim under ERISA for statutory penalties associated with

Defendants' failure to respond to document requests; (3) a claim for breach of contract, pleaded in the alternative to Count I, for recovery of the benefits allegedly owed under the Vested Producer Plan; and (4) a claim for breach of contract for recovery of reimbursements allegedly owed under the 2009 Agreement.  (*See id.* ¶¶ 48–85.)  On July 30, 2014, Defendants filed their Motion To Dismiss Plaintiff's first and second claims for relief.  (*See* Dkt. No. 27.)  On March 25, 2015, the Court denied the Motion.  (*See* Dkt. No. 39.)  A case management order was thereafter entered on April 28, 2015.  (*See* Dkt. No. 43.)  On December 15, 2015, Plaintiff stipulated to the dismissal of all claims against former-Defendant Verrino & Associates, Inc. (*See* Dkt. No. 50.)

On January 14, 2016, a status conference was held wherein the Parties indicated that a dispute had arisen with respect to the production of the phone records discussed above.  (*See* Dkt. (minute entry for Jan. 13, 2016).)  The Court ordered Plaintiff to produce the phone records that were in his possession and denied Defendants' request for additional depositions.  (*See* Dkt. No. 53.)  After additional letters from the Parties, (*see* Dkt. Nos. 56–57), the Court determined that the issue had been resolved, (*see* Dkt. No. 58.)  With leave from the Court, (*see* Dkt. No. 55), the Parties filed cross motions for summary judgment on August 8, 2016, (*see* Dkt. Nos. 80– 94).

On December 8, 2016, the Court requested that the Parties submit supplemental briefing on whether the Vested Producer Plan falls within ERISA's meaning of an "employee pension benefit plan."  (*See* Dkt. No. 95.)  After receiving an extension, (*see* Dkt. No. 97), the Parties filed their supplemental briefing on January 27, 2017, (*see* Dkt. Nos. 98–99).

<u>II.  Discussion</u>

Plaintiff moves for summary judgment on Count I seeking recovery of benefits allegedly owed under the Vested Producer Plan pursuant to ERISA.  Defendants move for summary judgment with respect to Counts I and II, and also on Counts III and IV seeking relief for breach of contract.

<u>A.  Standard of Review</u>

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PricewaterhouseCoopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal

quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

B.  Analysis

    1.  ERISA Claim

Plaintiff seeks partial summary judgment on Count I, namely, a determination that the Vested Producer Plan is governed by ERISA.

    a.  Governing Framework

ERISA governs employee benefit plans offered and administered "by any employer engaged in commerce or in any industry or activity affecting commerce."  29 U.S.C. § 1003(a)(1).  To prevail on an ERISA claim under 29 U.S.C. § 1132(a)(1)(B), a plaintiff must establish the existence of an employee benefit plan.  *See Hardy v. Adam Rose Ret. Plan*, 957 F. Supp. 2d 407, 413 (S.D.N.Y. 2013), *aff'd*, 576 F. App'x 20 (2d Cir. 2014); *see also Adams v. Intralinks, Inc.*, No. 03-CV-5384, 2004 WL 1627313, at *7 (S.D.N.Y. July 20, 2004) ("To state a claim under ERISA, a plaintiff must allege and establish the existence of an employee benefit plan that is governed by ERISA." (internal quotation marks)).

An employee benefit plan may be an "employee welfare benefit plan" or an "employee pension benefit plan."  29 U.S.C. § 1002(3).  An employee welfare benefit plan refers to a plan "established or . . . maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise," various medical, disability, death, and unemployment benefits.  *Id.* § 1002(1).  There is no allegation here that the Vested Producer Plan is an employee welfare benefit plan.

An employee pension benefit plan means:

[A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

    (i) provides retirement income to employees, or

> (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond . . . .

*Id.* § 1002(2)(A). Excluded from this definition are "payments made by an employer to some or all of its employees as bonuses for work performed, unless such payments are systematically deferred to the termination of covered employment or beyond, or so as to provide retirement income to employees." 29 C.F.R. § 2510.3-2(c). One court has offered six factors to determine whether a plan is an employee pension benefit plan, explaining that courts should consider:

> (1) [the plan's] express purpose, (2) whether the employer maintains discretion over awarding benefits, (3) whether the payments are given on the basis of work performed, (4) whether the payments systematically are deferred until the end of employment, (5) the manner in which the company promoted the plan, and (6) whether penalties were imposed to deter redemption until an employee retired.

*Boudinot v. Shrader*, No. 09-CV-10163, 2012 WL 489215, at *5 (S.D.N.Y. Feb. 15, 2012).

However, even if a benefit program fits the statutory and regulatory definition of an employee pension benefit plan, that does not end the inquiry. ERISA governs only the administration of "employee benefit plans" and "plans," both of which, as the Supreme Court has recognized, are defined only by reference to the definitions of employee welfare benefit plans and employee pension benefit plans. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8–9 (1987). In other words, although ERISA, by its plain terms, applies only to "plans," the statute offers no functional definition of "plan."

The Supreme Court has accordingly instructed, after analysis of the statutory structure and legislative history, that ERISA applies only to those benefit programs that require the implementation of an administrative scheme. *See id.* at 11–12; *see also Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 76 (2d Cir. 1996) ("[I]t is plain that ERISA subject matter jurisdiction depends upon the need for an administrative program . . . ."); *Castagna v. Luceno*,

No. 09-CV-9332, 2011 WL 1584593, at *19 (S.D.N.Y. Apr. 26, 2011) ("[T]he touchstone for determining the existence of an ERISA plan is whether a particular agreement creates an ongoing administrative scheme." (internal quotation marks omitted)), *aff'd*, 744 F.3d 254, 558 F. App'x 19 (2d Cir. 2014).  In order to determine whether a benefits program requires the implementation of an administrative scheme or program, the Second Circuit has instructed courts to consider: (1) "whether the employer's undertaking or obligation requires managerial discretion in its administration"; (2) "whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits"; and (3) "whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria." *Schonholz*, 87 F.3d at 76.

### b.  Employee Pension Benefit Plan

Defendants argue that the Vested Producer Plan does not fall within the statutory and regulatory definition of an employee pension benefit plan because the Vested Producer Plan provides a bonus for work performed and is therefore excluded by way of 29 C.F.R. § 2510.3-2(c), and because the Vested Producer Plan was not designed primarily for the purpose of providing retirement income and therefore does not fit the statutory definition set forth in 29 U.S.C. § 1002(2)(A).  (*See* Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 3–4, 12–16 (Dkt. No. 83); Defs.' Mem. of Law in Opp'n to Mot. for Partial Summ. J. ("Defs.' Opp'n") 3–4, 13–17 (Dkt. No. 91).)  Plaintiff argues that the Court has already determined that the Vested Producer Plan is an employee pension benefit plan within the meaning of ERISA. (*See* Pl.'s Opp'n 8–9).  Specifically, the Court held in its Opinion & Order on Defendants' Motion To Dismiss that "[h]ere, the issue is not whether the terms of the [Vested Producer Plan]

fit under the statutory and regulatory language; the Court has determined that they do."  (Op. & Order 25 (Dkt. No. 39).)

The Court recognizes that, in general, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."  *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991).  In this circumstance, however, the prior Opinion & Order was rendered in a different procedural context and without the benefit of a fully-developed record.  Accordingly, the Court will examine whether its holding regarding the applicability of ERISA and the regulations promulgated thereunder should be reconsidered in light of the complete record.

As an initial matter, by its text, the exclusion for plans that pay bonuses for work performed incorporates the statutory definition of "employee pension benefit plan."  In other words, if the Court determines that the Vested Producer Plan falls within the statutory definition of an employee pension benefit plan—that is, if it either "provides retirement income to employees" or "results in a deferral of income by employees for periods extending to the termination of covered employment or beyond"—that determination will, in effect, answer the question of whether the Vested Producer Plan is excluded by way of 29 C.F.R. § 2510.3-2(c).

With this framework in mind, when assessing whether a purported plan fits the statutory definition, circuit courts outside of the Second Circuit have held that "the paramount consideration is whether the primary purpose of the plan is to provide deferred compensation or other retirement benefits."  *Rich v. Shrader*, 823 F.3d 1205, 1210 (9th Cir. 2016), *cert. denied*, 2017 WL 69208 (Jan. 9, 2017); *see also Williams v. Wright*, 927 F.2d 1540, 1547 (11th Cir. 1991) (confining its analysis to "whether [the arrangement at issue] was designed primarily for the purpose of providing retirement income or whether the [arrangement] contemplated the

payment of post-retirement income only incidentally to a contract for current employment"); *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 575 (5th Cir. 1980) ("The words 'provides retirement income' patently refer only to plans designed for the purpose of paying retirement income whether as a result of their express terms or surrounding circumstances.").  Although the Second Circuit has not weighed in on the issue, a number of courts in the Second Circuit have agreed that when determining whether a benefits arrangement meets the statutory definition of an employee pension benefit plan (and one or both of the exceptions to the exclusion for bonus payments), courts should examine the purpose of the plan.  *See Hardy*, 957 F. Supp. 2d at 414 ("[G]enerally only plans designed for the purpose of paying retirement income should be considered to provide retirement income under ERISA." (internal quotation marks omitted)); *Hahn v. Nat'l Westminster Bank, N.A.*, 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000) ("A bonus plan excluded from ERISA will be found where payments made are not to 'provide retirement income,' but, instead, serve some other purpose, such as providing increased compensation as an incentive or reward for a job well done."); *Foster v. Bell Atl. Tricon Leasing Corp.*, No. 93-CV-4527, 1994 WL 150830, at *3 (S.D.N.Y. Apr. 20, 1994) ("[C]ourts elsewhere have held that only plans 'designed for the purpose of paying retirement income' should be considered to provide retirement income under ERISA." (quoting *Murphy*, 611 F.2d at 575)).

There is little question that the Vested Producer Plan falls within the regulation excluding from ERISA those plans that provide bonus payments.  The Vested Producer Plan, by its own terms, is designed to pay out a "bonus amount" to retiring employees, (2009 Agreement, at Schedule B), and McCartney and Verrino each indicated that the Vested Producer Plan was a bonus plan to reward a producer for his or her years of service based on his or her production, (*see, e.g.*, McCartney Tr. 50, 62; Verrino Tr. 60, 74).  The operative question, then, is whether

the Vested Producer Plan nonetheless falls under ERISA because it was designed for the purpose of paying retirement income or to provide deferred compensation benefits.

In its prior Opinion & Order, the Court held that the Vested Producer Plan "arguably results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, and therefore plausibly qualifies as an ERISA pension plan under the statutory language."  (Op. & Order 12.)  With the benefit of a complete record before it, the Court concludes that the Vested Producer Plan does not result in a deferral of income.  Although the statute and regulation do not define "deferral of income" or "deferred compensation," Black's Law Dictionary defines "deferred compensation" as either: (1) "[p]ayment for work performed, to be paid in the future or when some future event occurs," or (2) "an employee's earnings that are taxed when received or distributed rather than when earned, such as contributions to a qualified pension or profit-sharing plan."  *Deferred compensation*, Black's Law Dictionary (10th ed. 2014).  The Vested Producer Plan plainly does not fit either of these meanings:  The Vested Producer plan does not provide "[p]ayment for work performed," as the benefits paid out are separate from the commission payments earned by producers on each insurance sale, and the Vested Producer Plan does not provide for deferred tax treatment of any compensation.

Moreover, although a producer's entitlement to the benefits under the Vested Producer Plan vest on the seventh anniversary of the producer's employment, the benefits paid out by the Vested Producer Plan are calculated based on the commissions earned in the 12 months preceding the producer's retirement or death.  (*See* 2009 Agreement, at Schedule B.)  Thus, the benefits cannot even be calculated until the producer retires, and it therefore defies reason to suggest that the benefits paid out by the Vested Producer Plan—which are not quantifiable until

after a producer's departure—could be characterized as income that was earned at an earlier period during the employment and deferred until retirement.  Indeed, a vested producer that makes no sales (and earns no commission) in her final 12 months of work, though eligible for benefits under the Vested Producer Plan, would receive no additional compensation.  The Court has not found, and Plaintiff has not pointed to, any case law or other authority suggesting that this type of arrangement amounts to a deferral of compensation.  Thus, under the plain terms of the statute and the regulation, the Vested Producer Plan does not provide for deferred compensation.

Less certain, however, is whether the Vested Producer Plan provides for retirement income.  Although Defendants insist that the Vested Producer Plan was developed exclusively for the purpose of providing a "bonus" payment to reward high-performing producers, the record does not bear this assertion out.  For one, the plain terms of the Vested Producer Plan allow for distribution of benefits **only** upon a producer's "retirement or death."  (2009 Agreement, at Schedule B.)  Defendants argue that "[t]he mere fact that some payments under a plan may be made after an employee has retired or has left the company does not result in ERISA coverage by statutory definition."  (Supplemental Mem. of Law in Supp. of Def. McCartney & Rosenberry Group, Inc. d/b/a McCartney, Verrino & Rosenberry Insurance Agency's Mot. To Dismiss ("Defs.' Supplemental Mem.") 3 (Dkt. No. 99).)[3]  But the Vested Producer Plan does not provide that payments "may be made" after a producer has retired or passed away; the Vested Producer Plan provides that payments will **only** be made after a producer has retired or passed away.  In

---

[3] Defendants' supplemental memorandum of law is appended to the supplemental declaration of Lorin A. Donnelly.  (*See* Dkt. No. 99.)  Although the memorandum of law purports to be in support of Defendants' "Motion To Dismiss," it was, in fact, provided in support of the pending Motion for Summary Judgment.

each of the cases cited by Defendants, the court took issue with the fact that the payment of benefits after an employee's retirement was merely incidental to the benefits structure, which did not provide for post-retirement income in all circumstances.  *See, e.g.*, *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 189 (3d Cir. 2003) ("[The plaintiff's] post-retirement payments were only incidental to the goal of providing current compensation."); *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 933 (8th Cir. 1999) ("Though the [plan's] vesting requirement could result in the deferral of a portion of any earned incentive until a participant's termination or retirement . . . , such a deferral would only occur by happenstance."); *Murphy*, 611 F.2d at 575–76 ("The [agreement at issue] provides for benefits to be paid immediately to employees, not for their deferment in any fashion, systematic or otherwise . . . .  Some of the proceeds of [the royalty right] might be paid to an employee after he had retired or otherwise left [the defendant], or even to his heirs after his death, but this arose out of the inherent characteristics of the property used to pay the bonus.").  In none of the cases cited by Defendants was the court called upon to examine a plan which paid out benefits exclusively after retirement or death.  By contrast, in *Williams*, 927 F.2d 1540, where the defendants promised to pay plaintiff a $500 stipend each month upon his retirement, the court determined that the arrangement fell under ERISA, notwithstanding that the arrangement extended to only one employee and the recipient was expected to "function for the company in the manner of consultant and advisor on pest control matters."  *Id.* at 1542 n.3, 1547 (internal quotation marks omitted).[4]  The court distinguished *Murphy*, noting that the court in *Murphy* addressed only "payments that incidentally might be made after retirement but were not designed for retirement purposes."  *Id.* at 1547.

---

[4] Defendants misstate the holding of *Williams*.  (*See* Defs.' Supplemental Mem. 3.)

Here, the structure of the Vested Producer Plan demonstrates that the plan contemplates the provision of retirement income.  The payment of benefits under the plan is not incidental to an arrangement for payment of "current," rather than retirement, income to producers.  *See Murphy*, 611 F.2d at 575–76.  Indeed, a producer is not eligible to redeem any benefit until after retirement or death, and the amount of the benefit cannot even be determined until such time.  While the Vested Producer Plan certainly has a "bonus" aspect that pulls it within the scope of 29 C.F.R. § 2510.3-2(c), its provision of income paid out exclusively during retirement excepts it from that exclusion.

The facts developed during discovery confirm this view of the Vested Producer Plan.  For example, although McCartney testified throughout his deposition that the Vested Producer Plan was intended as a bonus payout, he once referred to the plan as a "pension."  (*See* McCartney Tr. 83.)  And the letter sent by McCartney and Verrino memorializing Plaintiff's refusal to sign Schedule F twice refers to the Vested Producer Plan as a "retirement plan."  (*See* Donnelly Decl. Ex. V.)  Moreover, the "MVR Lead Generation Program" to which Plaintiff signed onto in October 2010 refers to the Vested Producer Plan as the "producer vested retirement plan" and the "producer's vested retirement plan."  (*See* 2009 Agreement, at MVR Lead Generation Program.)  Thus, under both the "express terms" and the "surrounding circumstances," the Vested Producer Plan exists for the primary purpose of providing retirement income.

The Court does not find it persuasive, or even relevant, that Defendants also offered, separate from the Vested Producer Plan, a simple IRA.  (*See* 2009 Agreement, at Schedule A.)  Defendants have not provided, and the Court is not aware of, any case law suggesting that an employer's provision of an IRA or other retirement plan is evidence that other retirement income arrangements are not covered by ERISA.  Neither the statute nor the regulations suggest a

limitation on the number of ERISA-qualified plans an employer may provide, and Defendants were free to offer as many streams of retirement income to their employees as they desired.

Although not necessary, the Court concludes that the *Boudinot* factors support the conclusion that the Vested Producer Plan qualifies under ERISA. The first factor instructs the Court to consider the plan's express purpose. *See Boudinot*, 2012 WL 489215, at *5. Defendants argue that the plan's express purpose is to provide bonus compensation. (Defs.' Mem. 13.) *See also Hahn*, 99 F. Supp. 2d at 279–80. But as discussed above, and as recognized by the court in *Hahn*, the fact that a plan provides for bonus payments does not end the inquiry. *See Hahn*, 99 F. Supp. 2d at 279–80 (noting that "the plan proclaims its intent to provide bonus compensation," but noting that the "question arises whether the Plan is subject to either of the exceptions set forth in the Regulation"). Beyond that, while the Vested Producer Plan makes clear its purpose in providing a "bonus" payment to producers, it is equally clear that the payment is made only after the retirement or death of a producer over a period of 60 months. The express terms of the plan thus make clear that while the payments are paid out as a "bonus," they are paid out for the purpose of providing retirement income.

With respect to the second factor, Defendants did not retain discretion over awarding benefits, which weighs in favor of a finding an ERISA-qualified plan. *See Boudinot*, 2012 WL 489215, at *6. Defendants argue:

> The evidence clearly establishes that Kuhbier was not performing in accordance with the production goals set forth in the [2009] Agreement. As a consequence, at first [Defendants] rescinded the expense reimbursement that was included in the [2009] Agreement. Given the continued failure of Kuhbier to perform, [Defendants] removed Schedule B, which provided for the bonus payments. [Defendants] also had the discretion to reinstate the Vested Producer Plan retroactively when and if Kuhbier's production goals were met. Inasmuch as [Defendants] had managerial discretion to award the bonus in the first instance, the Vested Producer Plan does not constitute a retirement plan.

26

(Defs.' Mem. 14–15 (citations omitted).)  It is unclear from this passage whether Defendants intend to argue that they retained unilateral and unfettered discretion to rescind the Vested Producer Plan at any time.  To be sure, McCartney testified that it was his belief that because Schedule F was in writing, that was sufficient to effect removal of the Vested Producer Plan. (*See* McCartney Tr. 84–89.)  But the briefing offered by Defendants on this point does not make clear whether they are pressing this same theory.  In any event, not a single term of the 2009 Agreement authorizes that discretion, and in fact, the 2009 Agreement expressly provides otherwise, saying that "no waiver or modification of this Agreement or any covenant, condition, or limitation herein contained shall be valid unless in writing and duly executed by the parties to be charged therewith."  (2009 Agreement 3.)  It is thus beyond dispute that Defendants could not modify or eliminate the Vested Producer Plan merely by notifying Plaintiff of their intent to do so.

Defendants point also, however, to the production goals set forth in the 2009 Agreement, which set sales benchmarks for Plaintiff, (*see* 2009 Agreement, at Schedule A), arguing that because Plaintiff failed to meet his producer goals, Defendants retained the discretion to remove the Vested Producer Plan, (*see* Defs.' Mem. 14).  Again, nothing in the language of the 2009 Agreement supports this view.  The Vested Producer Plan, in fact, explicitly provides that violations of Sections 5 or 6 of the 2009 Agreement will result in forfeiture of the benefits; it says nothing about the producer goals set forth in Schedule A.  (*See* 2009 Agreement, at Schedule B.)  Defendants could have conditioned the payment of benefits under the plan on a producer meeting his sales goals, but they did not, and they cannot retroactively impose such a condition merely because it was their subjective belief or hope that they could do so.  However, even if Defendants' interpretation of the 2009 Agreement held water, that does not suggest that

Defendants could remove the Vested Producer Plan at their discretion.  Thus, even accepting
Defendants' representation about the operation of the 2009 Agreement with respect to the Vested
Producer Plan, this factor cuts in favor of Plaintiff.

The third factor asks whether the payments are given on the basis of work performed.
*See Boudinot*, 2012 WL 489215, at *5.  Defendants are correct that this factor weighs against
finding that the Vested Producer Plan is ERISA-qualified—the payments are calculated based on
the commissions earned in a producer's last 12 months.  (*See* 2009 Agreement, at Schedule B.)

Next, the Court must ask "whether the payments systematically are deferred until the end
of employment."  *Boudinot*, 2012 WL 489215, at *5.  As set forth above, the cases cited by
Defendants on this point are inapposite.  This is not an instance where some benefits may be paid
out after retirement—the Vested Producer Plan provides that *all* of the benefits will be paid out
*only* after retirement or death.  In *International Paper Co. v. Suwyn*, 978 F. Supp. 506 (S.D.N.Y.
1997), the case cited by Defendants in support on this point, the court held that the benefits
program did not fall within ERISA because "the program provide[d] for current, preretirement
income," and noted that "the plan's consequential effect of permitting some employees to enjoy
after retirement the benefits of [the plan] that were paid before retirement is merely incidental to
the goal of providing current compensation."  *Id.* at 511.  The Vested Producer Plan does not
provide for "current compensation"; it provides only for post-retirement income.  This factor cuts
in favor of finding that the Vested Producer Plan falls within ERISA.

The fifth factor is the manner in which the company promoted the plan.  *See Boudinot*,
2012 WL 489215, at *5.  As discussed above, while Defendants and their agents may have
subjectively believed that the Vested Producer Plan was designed to exclusively provide bonus
payments, and not retirement income, the undisputed facts on the record belie that interpretation.

In their letter sent to Plaintiff regarding his refusal to sign Schedule F, McCartney and Verrino twice refer to the Vested Producer Plan as a retirement plan.  (*See* Donnelly Decl. Ex. V.)  More importantly, the "MVR Lead Generation Program," a document incorporated into the 2009 Agreement by amendment, describes the Vested Producer Plan as the "producer vested retirement plan."  (*See* 2009 Agreement, at MVR Lead Generation Program (also describing the Vested Producer Plan as "the producer's vested retirement plan").)  The objective evidence thus indicates that the Vested Producer Plan, at least as of the time Plaintiff departed the Agency, was held out as a retirement plan.

Finally, on the issue of whether penalties were imposed to deter redemption until an employee retired, *see Boudinot*, 2012 WL 489215, at *5, the Court finds that this factor is either neutral or cuts slightly in favor of finding that the Vested Producer Plan qualifies as an ERISA plan.  Defendants argue that "there were no penalties imposed to deter redemption until retirement."  (Defs.' Mem. 16.)  While this is true as a technical matter, it is true only because the benefits could not even be redeemed until retirement or death.  The fact that there is no express penalty does not make this factor cut in favor of Defendants—it would be nonsensical to impose a penalty for early redemption where early redemption is not even an option.

The majority of the *Boudinot* factors weigh in favor of finding that the Vested Producer Plan is an "employee pension benefit plan" within the meaning of ERISA, and that finding is confirmed by an analysis of the statutory and regulatory language.  Accordingly, the Court finds that, with the benefit of a complete record, the Vested Producer Plan is designed for the purpose of providing retirement income and therefore qualifies as an employee pension benefit plan within the meaning of ERISA.

c.  Implementation of an Administrative Scheme

As the Parties recognize, even though the Vested Producer Plan falls within the statutory and regulatory definition of an "employee pension benefit plan," that does not end the inquiry. As set forth above, the Court must now examine whether the Vested Producer Plan is a "plan" as contemplated by the Supreme Court in *Fort Halifax Packing*, and to do so, the Court must examine the factors set forth in *Schonholz*.

The first factor asks "whether the employer's undertaking or obligation requires managerial discretion in its administration." *Schonholz*, 87 F.3d at 76.  In its prior Opinion & Order, the Court held that "determining whether the [p]roducer has reached seven years of employment is a ministerial task insufficient to require an ongoing administrative program," and also that "the mere fact that payments are to occur over 60 months is insufficient to require an ongoing administrative scheme."  (Op. & Order 20.)  Plaintiff has offered no persuasive reason why this analysis should be reconsidered at this stage.  (*See also* McCartney Tr. 81.)

The Court did not determine, however, whether the calculation of benefits owed was a "simple arithmetic calculation," (Op. & Order 20 (citing *James v. Fleet/Norstar Fin. Grp., Inc.*, 992 F.2d 463 467 (2d Cir. 1993))), which would cut against Plaintiff.  At that stage, instead, the Court accepted Plaintiff's representation that Defendants would "need to conduct discretionary analysis about which accounts are included in the Book of Business."  (*Id.* at 21.)  Upon review of the complete record, the Court sees no evidence that Defendants are entitled to exercise discretion with respect to the amount of benefits owed.  To be sure, the Parties dispute the process for calculating the amount of benefits owed under the Vested Producer Plan.  (*See* Defs.' 56.1 ¶ 67; Pl.'s Resp. 56.1 ¶ 67; *see also* Pl.'s Opp'n 3 n.1.)  But that the Parties dispute the calculation of benefits does not suggest that Defendants retain discretion—in fact, it suggests the

opposite, as Plaintiff's contention is that Defendants' calculation is incorrect as a matter of law. The amount owed under the Vested Producer Plan is set by the terms of the agreement as 35% of the commissions earned by the producer for McCartney & Rosenberry during the 12-month period preceding his or her retirement or death.  (*See* 2009 Agreement, at Schedule B.)  That number is derived from the "Producer Reports" or "Production Reports," (*see* McCartney Tr. 65–68; Verrino Tr. 74), and the Parties agree that certain categories of accounts are excluded from the gross commission, (*see* Defs.' 56.1 ¶ 67; Pl.'s Resp. 56.1 ¶ 67).  Because there is no evidence that the categories of accounts to be excluded are discretionary, there is therefore no reason to conclude that Defendants exercised discretion with respect to the amount of benefits paid under the plan.

The first factor, instead, turns on whether monitoring a producer's compliance with Sections 5 and 6 requires the exercise of managerial discretion.  The Court held in its prior Opinion & Order that it could not "say what factors will come into play in determining compliance with Sections 5 and 6."  (Op. & Order 22.)  With the benefit of a complete record, the Court is now equipped to make that determination.

The Second Circuit has consistently held that where an employer is required to "examine the circumstances of each covered employee's termination," there is an exercise of discretion. *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 567 (2d Cir. 1998); *see also Okun v. Montefiore Med. Ctr.*, 793 F.3d 277, 280 (2d Cir. 2015) ("[T]he [p]olicy requires discretion and individualized evaluation to administer.  In particular, [the employer] must determine whether an employee left voluntarily or was terminated; it must determine whether the termination was 'for cause' or for one of the other reasons listed in the [p]olicy; and the President of [the employer] is required to engage in a discretionary review of the amount of severance benefits whenever an

employee within fifteen or more years of service requests it." (footnote omitted)).  Such discretion may similarly be exercised where, for example, the employer is called upon to determine an employee's compliance with a non-compete provision.  *See Verdier v. Thalle Constr. Co.*, No. 14-CV-4436, 2017 WL 78512, at *2 (S.D.N.Y. Jan. 5, 2017) (finding that a plan provided for employer discretion where the plan "permit[ted] [the] [d]efendant to analyze individual compliance with the [a]greement's non-compete provision"); *Blair v. Young Phillips Corp.*, 158 F. Supp. 2d 654, 662 (M.D.N.C. 2001) (finding that a plan provided for employer discretion where the "[a]greement at issue grant[ed] [the] [d]efendants discretion to determine . . . [the] [p]laintiff's compliance with the non-compete covenant"); *see also Tischmann*, 145 F.3d at 567 (noting numerous restrictions on an employee's post-termination conduct and holding that "[b]y its terms, then, the plan's benefits structure incorporates numerous context-sensitive judgments, requiring managerial discretion on a continuing, individualized basis").

Defendants argue that "[i]n determining compliance with Sections 5 and 6 of the [2009] Agreement, all [Defendants] did was monitor which clients were leaving and if [Defendants] suspected that someone was violating Section[s] 5 or 6 of the [2009] Agreement they could look in the computer system and at the phone records." (Defs.' Mem. 10.)  This statement fails the eye-test—the process described by Defendants is in no way simple or straight-forward.  And the testimony from Defendants' agents does not support the claim that "all" Defendants had to do was "look in the computer system and at the phone records"—both McCartney and Verrino confirmed that if they suspect an employee of violating Sections 5 or 6, they would commence an investigation.  (*See* McCartney Tr. 78; Verrino Tr. 90.)  As other courts have recognized, *see, e.g.*, *Tischmann*, 145 F.3d at 567; *Verdier*, 2017 WL 78512, at *2, such an investigation would naturally include some exercise in discretion; it strains credulity to suggest that any employer

could determine ongoing compliance with confidentiality and non-compete clauses merely by referencing its own computer or phone records, and neither McCartney nor Verrino so testified. But perhaps the most damning piece of evidence on this point is the fact that during this litigation, Defendants sought and obtained, via a court order, discovery related to allegations that Plaintiff may have breached Sections 5 and 6.  (*See* Dkt. (minute entry for Jan. 13, 2016); Dkt. Nos. 53, 58.)  If determining compliance with Sections 5 and 6 is as simple as Defendants posit, the Court questions why they required a court order to do so.

Upon review of the complete record, the Court agrees with Plaintiff that determination of compliance with Sections 5 and 6 necessarily involves some exercise of discretion.  In the same way that determination of whether an employee's termination was "for cause" will necessarily entail some assessment of the employee's individual circumstances, determination of compliance with a non-compete or confidentiality clause requires an employer to assess, and possibly investigate, the conduct of the employee both during and after the employment period.  Such assessment requires the exercise of discretion with regard to the scope of the employee's obligations under the non-compete or confidentiality provisions, the nature of the employee's conduct, and, perhaps, a determination as to whether minor infractions ought to be excused. These are the type of "context-sensitive judgments" that the Second Circuit has found require "managerial discretion on a continuing, individualized basis."  *Tischmann*, 145 F.3d at 567.  As Defendants' assertions to the contrary are unsupported by any evidence in the record, the Court finds that the first *Schonholz* factor weighs in favor of finding that the Vested Producer Plan is a "plan" within the meaning of ERISA.

Next, the Court must assess whether "whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits."  *Schonholz*, 87 F.3d at 76.

33

Under this factor, the Court may consider, among other things, (1) whether the plan "is subject to termination or amendment" by the employer, *Tischmann*, 145 F.3d at 566, (2) whether the employer or employee has "ongoing responsibilities under the agreements," *Nowak v. Int'l Fund Servs. (N.A.), L.L.C.*, No. 09-CV-5103, 2009 WL 2432715, at *2 (S.D.N.Y. Aug. 7, 2009); *see also Sheer v. Isr. Disc. Bank of N.Y.*, No. 06-CV-4995, 2007 WL 700822, at *2 (S.D.N.Y. Mar. 7, 2007) ("There are no ongoing responsibilities on the part of the [employer] or the employees pursuant to either agreement once the employee receives her severance payment and leaves the company."), and (3) whether the benefits are a "fixed amount" or whether the employer would "have to determine the amount in each individual case," *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 737 (2d Cir. 2001).

A review of these considerations reveals that the second *Schonholz* factor cuts in favor of finding an ongoing administrative scheme. First, as set forth above, the Vested Producer Plan is not "subject to termination or amendment" by the employer. *Tischmann*, 145 F.3d at 566. Nowhere in the Vested Producer Plan did Defendants reserve for themselves the right to unilaterally terminate or amend the plan, and the terms of the 2009 Agreement plainly provide otherwise.

Second, although Defendants are correct that its obligations under the Vested Producer Plan are limited to sending monthly checks, (Defs.' Mem. 10), and that this type of employer obligation has been found insufficient, on its own, to establish an ongoing administrative scheme, *see, e.g.*, *Nowak*, 2009 WL 2432715, at *2 ("[N]o reasonable employee could conclude that [the employer] was making an 'ongoing commitment' to provide benefits when it entered into these individualized agreements. [The employer] had no ongoing responsibilities under the agreements other than sending checks and [the] [p]laintiffs had no obligations to [the

employer].”), courts also examine whether the employee has ongoing responsibilities, *see, e.g.*,
*Lamantia v. Keyspan Energy*, No. 05-CV-3300, 2007 WL 2816188, at *5 (E.D.N.Y. Sept. 26,
2007) (assessing the parties’ respective ongoing obligations and noting that “unlike in cases such
as *Tischmann v. ITT/Sheraton*, where the employee receiving severance was required to be
available ‘to render services to the company under “reasonable circumstances,”’ there is no such
requirement here” (citation omitted) (quoting *Tischmann*, 145 F.3d at 567)); *Sheer*, 2007 WL
700822, at *2 (“This case is unlike *Tischmann* which had a lump-sum payment and a ‘for cause’
determination of the circumstances of the termination, as here; but the *Tischmann* employee had
to ‘to [sic] be available’ to render services to the company under ‘reasonable circumstances.’
Furthermore, benefits could be terminated if the employee violated one of the other enumerated
provisions of the agreement.  These continuing obligations do not exist here.” (citations omitted)
(quoting *Tischmann*, 145 F.3d at 567)).  Here, like the employee in *Tischmann*, Plaintiff does
have an ongoing responsibility to comply with Sections 5 and 6 of the 2009 Agreement.  And
while Defendants may be correct that a predetermined payment of the benefits over a number of
months is functionally indistinguishable from a lump-sum payment, *see, e.g.*, *In re Lyondell
Chem. Co.*, 445 B.R. 296, 300 (Bankr. S.D.N.Y. 2011) (“[W]hile the [c]ontract is an annuity and
thus not a single lump-sum payment, it is much closer in concept to a single payment than to a
complex plan.”), the fact that separation or retirement benefits are paid out in a lump sum, or the
functional equivalent, has never been held by the Second Circuit to be a dispositive fact, *see,
e.g.*, *Okun*, 793 F.3d at 280–81 (“Here, [the employer] has undertaken to pay severance every
time an eligible employee is terminated for reasons other than cause—a contingency that
reasonably can be inferred to occur on a relatively regular basis.”); *Tischmann*, 145 F.3d at 567
(“This provision merely allows [the employer], with respect to any given recipient, to transform

35

its continuing obligation into a one-time payment.  It does not mean that [the employer] has not

made an 'ongoing' commitment to pay benefits—whether in the form of periodic or lump-sum

payments—to covered employees in the event their employment is terminated.").  Moreover,

while predetermined monthly payments are, in many ways, similar to a lump-sum distribution,

the critical difference is that monthly payments impose on the employer, at least in this case, not

only the obligation to make monthly distributions, but also, as set forth above, a duty to conduct

ongoing monitoring of the employee's compliance with non-compete and confidentiality clauses.

There are thus continuing responsibilities by the employer and the employee not present in the

cases cited by Defendants.

   With respect to the third consideration, it is readily apparent that the determination of

benefits owed requires an individualized assessment of each qualifying producer's Book of

Business.  (*See* McCartney Tr. 96–97; *see also* 2009 Agreement, at Schedule B.)  This weighs in

favor of Plaintiff.  *See Kosakow*, 274 F.3d at 737 (finding an ongoing commitment by the

employer where "the amount of severance [was] not a fixed amount and, consequently, the

employer would presumably have to determine the amount in each individual case").

Accordingly, the second *Schonholz* factor also weighs in favor of finding an ongoing

administrative scheme.

   Finally, the third *Schonholz* factor calls upon the Court to ask "whether the employer was

required to analyze the circumstances of each employee's termination separately in light of

certain criteria."  *Schonholz*, 87 F.3d at 76.  This factor is neutral: while the Vested Producer

Plan does require Defendants to determine that a retiring producer is eligible under the plan, with

the exception of assessing ongoing compliance with Sections 5 and 6, that determination is

largely mechanical.  And the precise circumstances of the producer's departure do not require

any close scrutiny—so long as the producer is retiring or has passed away, they are entitled to any vested benefits under the plan.

Considering all three of the *Schonholz* factors, the Court concludes that the Vested Producer Plan is a "plan" within the meaning of ERISA.  The first two factors weigh strongly in favor of finding a "plan," as the undisputed evidence shows that Defendants must exercise discretion in monitoring ongoing compliance with Sections 5 and 6; that Defendants are subject to an ongoing, irrevocable commitment to provide benefits; that departing producers are subject to ongoing compliance with Sections 5 and 6; and that calculation of benefits requires an individualized determination with respect to each eligible producer.

Defendants argue, however, that notwithstanding the *Schonholz* factors, "there were none of the usual earmarks of an ERISA plan in the Vested Producer Plan."  (Defs.' Mem. 12.) Specifically, Defendants point out that "there was no indication of a 'plan administrator'; there were no plan 'fiduciaries'; there was no provision for seeking administrative review; there were no employee contributions; there were no procedures for submitting 'claims'; and there were no monies set aside or held in trust."  (*Id.* (citing *Taverna v. Credit Suisse First Boston (USA), Inc.*, No. 02-CV-5240, 2003 WL 255250, at *4 (S.D.N.Y. Feb. 4, 2003)).)  But the Second Circuit has never held, or even suggested, that such indicia are necessary for a plan to fall within ERISA. While the Court agrees that the Vested Producer Plan is perhaps not what legislators had in mind when they crafted ERISA, the Supreme Court and the Second Circuit have already interpreted the statute and accompanying regulations and determined which factors a court should take into consideration.  Were the existence of a plan administrator, plan fiduciaries, or any of the other things listed by Defendants necessary for a determination that a plan fell within ERISA, the Court is confident that the Second Circuit could have so held in any of the several cases outlining

the requirements of an ERISA plan.  But as the Second Circuit has so clearly defined the factors

a court should consider when determining whether an arrangement is a "plan" within the

meaning of ERISA, the Court is not entitled to disregard those factors in favor of Defendants'

proposed paradigm.  Notably, the court in *Taverna*, the case cited by Defendants on this point,

determined that none of the *Schonholz* factors weighed in favor of finding a "plan" under

ERISA.  *Taverna*, 2003 WL 255250, at *3–4.  Thus, even the authority cited by Defendants does

not support the notion that the Court may abandon the *Schonholz* factors simply because a plan

does not bear what Defendants contend are the hallmarks of an ERISA plan.

The Court thus concludes that the Vested Producer Plan is a "plan" within the meaning of

ERISA.  Because the Vested Producer Plan falls within the statutory and regulatory meaning of

an "employee pension benefit plan," and because it is a "plan" within the meaning of ERISA, the

Vested Producer Plan is governed by ERISA, and Plaintiff is entitled to any benefits for which

he is eligible under the plan.  Because Count III, seeking damages for breach of contract, was

pleaded in the alternative to Count I, (*see* Compl. ¶¶ 69–79), Count III is dismissed, without

prejudice to renew the claim should this or another court subsequently determine that the Vested

Producer Plan is not covered by ERISA.  *See Arditi v. Lighthouse Int'l*, 676 F.3d 294, 299 (2d

Cir. 2012) (holding that state law breach of contract claims were preempted by ERISA because

the defendant's "obligations under the [p]lan [were] 'inextricably intertwined with the

interpretation of [p]lan coverage and benefits' and 'do not create a sufficiently independent duty

under [*Aetna Health Inc. v.*] *Davila*[, 542 U.S. 200 (2004)]." (alteration omitted) (quoting

*Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 332 (2d Cir. 2011)).

<u>d.  Eligibility Under the Plan</u>

Having found that the Vested Producer Plan is governed by ERISA, the Court must now consider what, if any, benefits Plaintiff is eligible for.  There is no dispute that Plaintiff's length of employment was long enough to qualify him for the Vested Producer Plan.  Defendants argue, however, that Plaintiff is not eligible for benefits because (1) he breached the 2009 Agreement by failing to meet his sales goals, (2) Plaintiff did not retire or die, and (3) the evidence has not established that Plaintiff did not violate Sections 5 or 6.  (Defs.' Opp'n 18–22.)  The Court will address each contention in turn.

An ERISA claim for benefits due, "in essence, is the assertion of a contractual right." *Feifer v. Prudential Ins. Co. of Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002) (internal quotation marks omitted).  Thus, "[i]n interpreting plan terms for purposes of claims under § 1132(a)(1)(B), [the Court] appl[ies] a federal common law of contract, informed both by general principles of contract law and by ERISA's purposes as manifested in its specific provisions."  *Id.*; *see also Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 84 n.4 (2d Cir. 2001) ("Contract law therefore guides our determination of whether, under ERISA, [the] plaintiffs are entitled to 'enforce their rights under the terms of the plan.'" (alteration omitted) (quoting 29 U.S.C. § 1132(a)(1)(B))).  Accordingly, "in ERISA cases, state law does not control. Instead, general common law principles apply."  *Devlin*, 274 F.3d at 84 n.5; *see also Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 117 (S.D.N.Y. 2016) ("The validity of assignments for ERISA purposes is a question of federal common law." (alterations and internal quotation marks omitted)).  Courts outside of the Second Circuit have held that "[w]hen applying federal common law to contract issues, courts generally look to the Restatement for guidance."  *United States ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 451 (4th Cir. 2011); *see also Bowden v.*

*United States*, 106 F.3d 433, 439 (D.C. Cir. 1997) (holding that the Restatement (Second) of Contracts is the source "from which [the court] would be inclined to fashion a federal common law rule since those principles represent the 'prevailing view' among the states").

Defendants' argument with respect to Plaintiff's alleged failure to meet his sales goals takes two forms.  First, Defendants argue that the sales goals were a condition precedent to the Vested Producer Plan and that failure to meet the sales goals precludes Plaintiff from collecting under the Vested Producer Plan.  A condition precedent "is an event, not certain to occur, which must occur, unless its non-performance is excused, before performance under a contract becomes due."  Restatement (Second) of Contracts § 224 (Am. Law Inst. 1981).  "Whether language in a contract is a condition precedent depends on the parties' intent as gathered from the language of the contract."  17A Am. Jur. 2d *Contracts* § 449 (1964).  In general, "[a] contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition."  *Id.*; *see also AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 625 (2d Cir. 1996) (same).  The defense that a plan participant has failed to comply with a condition precedent has been recognized as valid in the ERISA context.  *See Novick v. Metro. Life Ins. Co.*, 764 F. Supp. 2d 653, 667 (S.D.N.Y. 2011) ("It is undisputed that where an insured fails to comply with a condition precedent to insurance coverage, the insurance contract is vitiated." (internal quotation marks omitted)); *Hogan v. Metromail*, 107 F. Supp. 2d 459, 476 (S.D.N.Y. 2000) (noting that some courts have recognized, in certain contexts, "actual employment termination to be a condition precedent to eligible for ERISA-protected benefits").

Here, there is no language whatsoever that suggests, implies, or even hints that the production goals set forth in Schedule A of the 2009 Agreement are a condition precedent to the

Vested Producer Plan.  Those goals are laid out in a separate schedule to the 2009 Agreement, they make no reference to the Vested Producer Plan, express or otherwise, and the Vested Producer Plan itself makes no mention of those goals.  (*See* 2009 Agreement, at Schedules A, B.)  And the fact that the Vested Producer Plan makes clear that benefits will be paid out only if the producer has complied (and continues to comply) with Sections 5 and 6, (*see* 2009 Agreement, at Schedule B), is a strong indicator that the Parties did not intend, or at least did not memorialize their intent, to make the payout of benefits contingent on the achievement of the sales goals set forth in a different Schedule.  Defendants have not pointed to any language in the 2009 Agreement supporting their argument, offering only the conclusory assertion that "the sales goals were a condition precedent to [Plaintiff's] right to any benefits under the [2009] Agreement." (Defs.' Opp'n 20.)  Defendants' argument here thus falls flat.

Next, Defendants assert that Plaintiff's purported breach of the sales goals was a material breach of the contract that excused their performance.  "Prior material breach is a federal common law defense asserted when a party breaches a contract after another party has already breached the same contract."  *Laguna Constr. Co. v. Carter*, 828 F.3d 1364, 1369 (Fed. Cir. 2016).  The Restatement (Second) of Contracts states that "[i]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."  Restatement (Second) of Contracts § 237 (Am. Law Inst. 1981).  The Restatement goes on to explain that:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* § 241.  "The determination whether a material breach has occurred is generally a question of fact."  23 Williston on Contracts § 63:3 (4th ed.); *accord Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain."); *Miller v. Mills Constr., Inc.*, 352 F.3d 1166, 1172 (8th Cir. 2003) ("Whether a party's conduct amounts to a material breach is a question of fact."); *Designer Direct, Inc. v. DeForest Redev. Auth.*, 313 F.3d 1036, 1042 (7th Cir. 2002) ("The issue of whether a party's breach is material presents a question of fact."); *Valley Nat'l Bank v. Abdnor*, 918 F.2d 128, 130 (10th Cir. 1990) ("The trial court's finding of a material breach of contract is a question of fact . . . ."); *Katz v. Berisford Int'l PLC*, No. 96-CV-8695, 2000 WL 959721, at *3 (S.D.N.Y. July 10, 2000) ("Materiality is a question of fact to be determined by the jury . . . .").

The Court has not found any cases discussing the applicability of the doctrine of material breach to an ERISA contract.[5]  However, as ERISA claims are governed by the federal common

---

[5] The Court notes that this dearth of authority may stem from the fact that ERISA plans are not ordinarily executed alongside general employment contracts.  Here, however, the informal nature of the Vested Producer Plan and its inclusion in the 2009 Agreement, which imposes a number of obligations on both the Agency and Plaintiff, creates a unique situation which may warrant the consideration of contractual defenses not otherwise typically raised in an ERISA suit.

law of contracts, *see Feifer*, 306 F.3d at 1210, material breach is a generally-recognized defense in a contract suit, *see* Restatement (Second) of Contracts § 237 (Am. Law Inst. 1981), and Plaintiff has offered no reason why general contract defenses would not be available in an ERISA suit, the Court concludes that a party's material breach of an ERISA contract may be a defense in an action for benefits due, even where the provision in question is not a condition precedent to the collection of benefits.

There is no dispute between the Parties that Plaintiff did not meet his production goals. (*See* Defs.' 56.1 ¶ 68; Pl.'s Resp. 56.1 ¶ 68.)  Plaintiff points out, however, that although Defendants met with him at various times to discuss his performance, they never terminated his employment or significantly reduced his compensation.  (*See* Pl.'s Opp'n 10–11.)  Plaintiff argues that this leads to the conclusion, though not an inexorable one, that Defendants did not consider his failure to meet production goals a material breach of the 2009 Agreement.

The Court agrees with Plaintiff that there exists a dispute of material fact as to whether Plaintiff materially breached his obligations under the 2009 Agreement.  The sales goals provision is but one of many obligations imposed on producers, and is not even included in the main section of the 2009 Agreement.  (*See* 2009 Agreement, at Schedule A.)  And while the record reflects that Plaintiff failed to meet his production goals throughout his employment at the Agency, (*see* McCartney Tr. 86, 88–89, 91, 125; Verrino Tr. 123–24), it was not until October 2010 that Defendants expressed any dissatisfaction with his performance, (*see* Kuhbier Tr. 105–07).  At none of the meetings and in none of the letters, however, did Defendants indicate that Plaintiff's failure to meet his production goals made him ineligible for the Vested Producer Plan. Only in January 2012 did the owners express to Plaintiff that he was "in violation" of the 2009 Agreement and that his "future" with Defendants was in jeopardy.  (Donnelly Decl. Ex. V.)  The

Court therefore cannot say, as a matter of law, that Plaintiff's breach of his sales obligations under the 2009 Agreement was a material breach that excused nonperformance by Defendants.

Defendants next argue that Plaintiff is not entitled to any benefits under the Vested Producer Plan because he "resigned" and did not "retire," as contemplated by the plan. (*See* Defs.' Opp'n 21 (citing Donnelly Decl. Ex. W).)  But Defendants give no explanation for what the functional difference between these two actions is.  Certainly, the word "retire" may be a term of art in some contexts, but Defendants chose not to incorporate any specialized definition into the Vested Producer Plan or any other part of the 2009 Agreement.  And the testimony of McCartney confirms that the Agency's interpretation of "retire," at least with respect to the Vested Producer Plan, was simply that an employee was no longer working at the Agency.  (*See* McCartney Tr. 81.)  If Defendants' only point is that Plaintiff wrote that he was "resigning" instead of "retiring," the Court sees no need to indulge this argument any further.

Finally, Defendants argue that Plaintiff "has failed to establish that he did not [violate Sections 5 or 6] with any evidence in[ ]admissible form."  (Defs.' Opp'n 21.)  Defendants base this assertion on the fact that discovery has revealed that Plaintiff made phone calls to three of the Agency's clients after he left the Agency, and criticize Plaintiff's affidavit explaining the purpose of those calls as "self-serving and conclusory."  (*See id.*)  There is no law, however, preventing a court from relying on "self-serving" affidavits—indeed, parties in a litigation routinely submit affidavits on their own behalf whose only purpose is to substantiate the claims alleged.  *See Dye v. Kopiec*, No. 16-CV-2952, 2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016) ("[The] [d]efendant's declaration cannot be disregarded merely because it is self-serving."); *Shami v. Nat'l Enter. Sys.*, 914 F. Supp. 2d 353, 358 (E.D.N.Y. 2012) ("[A]n affidavit is not automatically discredited merely because it is self-serving.").  If Defendants believe that

Plaintiff has violated the terms of the Vested Producer Agreement, they could have used discovery to explore that possibility.  Instead, Defendants waited until the close of discovery to pursue that inquiry, and the scope of their inquiry was appropriately limited as a result of their tardiness.  (*See* Dkt. No. 53.)  It is Plaintiff's burden to show that he is eligible for benefits under the Vested Producer Plan, but that does not impose on him an obligation to disprove noncompliance with the various restrictions in the plan.  Even if it did, however, Plaintiff has submitted an affidavit explaining the phone calls made, and in the absence of any evidence by Defendants contradicting the information set forth in that affidavit, the Court sees no reason to entertain Defendants' unsupported allegations to the contrary.

Defendants have thus not established that, as a matter of law, Plaintiff is not entitled to benefits under the Vested Producer Plan.  There is a question of fact as to whether Plaintiff's breach of the sales goals provision was a material breach that excused performance by Defendants.  Defendants' Motion for Summary Judgment on Plaintiff's claim under § 1132(a)(1)(B) for benefits due is therefore denied.

### 2.  Contract Claim

Defendants have also moved for summary judgment with respect to Count IV, alleging breach of contract.[6]  The reasoning set forth above with respect to Defendants' arguments regarding conditions precedent and material breach apply with equal force here.  The Court notes, however, that Plaintiff's surviving breach of contract claim relates to a different section of the 2009 Agreement, namely, the provision in Schedule A providing for monthly reimbursement for expenses related to a producer's sales and employment at the Agency.  (*See* Compl. ¶¶ 80–85.)  Like the Vested Producer Plan, there is no language in Schedule A suggesting that the sales

---

[6] Count III has been dismissed without prejudice.  *See supra.*

goals provision is a condition precedent to the reimbursement provision. Moreover, as above, there remain questions of material fact with respect to whether a breach of the sales goals provision constitutes a material breach such that performance under the reimbursement provision is excused. Accordingly, the analysis set forth above regarding Plaintiff's ERISA claim for benefits due similarly counsels in favor of denying Defendants' Motion for Summary Judgment.

### III. Conclusion

Because the Court holds that the Vested Producer Plan is governed by ERISA, Plaintiff's Motion for Partial Summary Judgment is granted in part. Because genuine disputes of material fact exist as to whether Plaintiff has materially breached the 2009 Agreement, Plaintiff's Motion for Partial Summary Judgment is denied in part, and Defendants' Motion for Summary Judgment is denied. The Court will hold a conference on April 26, 2017 at 11:00 AM. The Clerk of Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 80, 84.)

SO ORDERED.

DATED:     March 8 , 2017
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

46